1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FRAZIER,<br><br>                  Plaintiff,<br><br>     v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>                  Defendant. | 1:02-CV-6509 OWW DLB<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT<br>(DOC. 48) |

## I.   INTRODUCTION

This wrongful termination/employment discrimination lawsuit was removed from state court on December 7, 2002.  Before the court for decision is Defendant United Parcel Service's ("UPS") motion for summary judgment.  Doc. 48, filed Feb. 10, 2005. Plaintiff opposes this motion.  Doc. 59, filed Feb. 25, 2005.[1]

---

[1]   Both parties are admonished that the legal research and writing exhibited in their briefs is less than satisfactory. Both parties make numerous "legal" arguments that are wholly unsupported by legal authority.  Particularly troubling is Plaintiff's opposition, which is littered with conclusory assertions that are supported only by references to an attached statement of fact.  The referenced statements of fact then direct the reader's attention to large excerpts from Plaintiff's deposition transcript.  The law is unambiguous, no court is required to search a record when a party has failed to adequately reference matter that is pertinent. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001)("The District Court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

## II.  **PROCEDURAL HISTORY**

Plaintiff's complaint, initially filed in state court, is not a picture of clarity.  Frazier's first claim, entitled "Tortious Wrongful Termination in Violation of Public Policy" appears to allege that UPS's decision to terminate Frazier constituted: (a) unlawful retaliation in response to Frazier's refusal to work under unsafe conditions; (b) discrimination on the basis of Frazier's race; and (c) unlawful retaliation against Plaintiff for complaining about racial discrimination.  Plaintiffs second claim alleges that UPS defamed him by publishing statements concerning Plaintiff's insubordination and termination for job abandonment.  Finally, Plaintiff's third claim, entitled "race discrimination and harassment" appears to allege that UPS committed a number of discriminatory acts unrelated to Plaintiff's termination.[2]  Plaintiff's seeks punitive damages.  *Id*. at 12.

UPS removed the case to federal court on December 7, 2002.  Doc. 1.  Plaintiff moved to remand.  Doc. 7, filed Jan. 3, 2003.  UPS opposed remand on the grounds that Plaintiff's defamation claim is preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  Doc. 16, filed Jan. 30, 2003.  Magistrate Judge Lawrence J. O'Neill ruled that the defamation claim is preempted by LMRA § 301, and denied Frazier's motion to remand. Doc. 25, filed Apr. 16, 2003.

---

[2]    The original complaint named as defendants UPS, John Acha (the Sequoia Division Package Division Manager), and Steve Johnson (the East Bay District Feeder Division Manager).  Frazier never served defendant Acha, and dismissed the claims against Acha voluntarily on September 23, 2002.  On July 18, 2003, Frazier voluntarily dismissed his claims against defendant Johnson with prejudice.  UPS is the only remaining defendant.

1

### III.   FACTUAL BACKGROUND

2    Thomas Frazier is an African American male.  He began

3  working for UPS in 1987 as a "loader/unloader," a non-driving

4  position.  Frazier became a "package car driver" in 1989 or 1990,

5  which required him to drive a UPS delivery vehicle.  He later

6  became a "relief feeder driver," transporting packages between

7  distribution centers in large 18-wheel tractor-trailers, a

8  position he held until his formal termination on March 29, 2001.

9    #### A.   Frazier's Employment Contract with UPS

10    Once Frazier began driving large tractor-trailers for UPS,

11  his employment was governed by the terms of a collective

12  bargaining agreement ("CBA") between UPS and the International

13  Brotherhood of Teamsters ("Teamsters").  (UPS is a "Union Shop"

14  and Frazier was a union member.)  Among other things, the CBA

15  governs the reporting of safety concerns to UPS and the process

16  drivers must follow if they believe UPS has not adequately

17  responded to their concerns.

18           The Employer shall not require employees to take out on
         the street or highways any vehicle that is not in a
19         safe operating condition or not equipped with the
         safety appliances prescribed by law. It shall not be a
20         violation of the Agreement where employees refuse to
         operate such equipment unless such refusal is
21         unjustified. All equipment which is refused because not
         mechanically sound or not properly equipped, shall be
22         appropriately tagged so that it cannot be used by other
         drivers until automotive maintenance department has
23         adjusted the complaint.
                         * * *
24         Employees shall immediately, or at the end of their
         shifts, report all defects of equipment on a suitable
25         form furnished by the Employer. The Employer shall not
         ask or require any employee to take out equipment that
26         has been reported by any other employee as being in an
         unsafe operating condition until same has been approved
27         as being safe by the automotive maintenance department.
         (NCSA, Art. 11, § 2)
28

3

It shall not be a violation of this Agreement, or cause for disciplinary action, where employees refuse to operate equipment or a vehicle when such operation constitutes a violation of any state or federal rules, regulations, standards or orders applicable to commercial motor vehicle safety or health, or because of the employee's reasonable apprehension of serious injury to himself/herself or the public due to the unsafe conditions as set out in any state or federal rules, regulations, standards or orders applicable to commercial motor vehicle safety or health to include Part 392.14 of the Federal Motor Carrier Regulations. (NMUPSA, Art. 18, § 1)

The CBA also controls the process by which a covered employee may be terminated for just cause, the procedures for disciplinary action, and the manner in which grievances are handled:

An employee may be discharged or suspended for just cause subject to the provisions and procedures contained in Art. 7. (NCSA, Art. 4)

In all cases, except theft, intoxication, use, sale, or possession of illegal narcotics and gross insubordination, each having occurred on the job, an employee to be discharged shall be allowed to remain on the job, without loss of pay, unless and until the discharge is sustained under the grievance procedure. In suspension cases, the employee shall be allowed to remain on the job, without loss of pay, unless and until the suspension is sustained under the grievance procedure. (NCSA, Art. 7, § 4(b).)

Within 5 days of the occurrence of the alleged cause for discharge or suspension, the Employer shall give written notice by certified mail to the employee and to the Local Union of its decision to discharge or suspend the employee and such notice shall set forth the reasons for the discharge or suspension. If the Employer fails to give such written notice within the specified five (5) day period, the right to discharge or suspend for that particular reason shall be waived. (NCSA, Art. 7, § 4(c))

In order to terminate an employee covered by the CBA, UPS must first issue a written notice of discharge or suspension. Except for certain offenses, the employee must be permitted to continue work during the grievance process.  The union may then

**4**

file a grievance on behalf of the employee, triggering a "local review" in which the employee, a union representative, and UPS managers discuss the proposed disciplinary action.  If the matter is not resolved during local review, the dispute is referred to the UPS Labor Management Committee ("LMC"), a panel made up of representatives from UPS and the Teamsters.  The LMC reviews the disciplinary decision and votes on any proposed resolution.  If deadlocked, the parties may refer the dispute to arbitration.

**B.   Plaintiff's Employment History**

Since 1989, UPS issued a total of nine (9) warning letters, three (3) suspension letters, and fifteen (15) discharge letters to Frazier for undependability (including absenteeism and tardiness), failure to follow instructions, insubordination, inappropriate conduct (including the use of extremely offensive profanity), and job abandonment.  The first thirteen discharge letters resulted in "working discharges" and were either reduced to warnings or suspensions during the local review process.  The final two discharge letters, for insubordination and then job abandonment, were upheld by the LMC.

**C.   Plaintiff's Duties Concerning Safety**

Plaintiff's other duties as a UPS driver required him to inspect his vehicle and identify safety problems.  Feeder drivers, for example, must perform a pre-trip inspection and must document the condition of the vehicle in a log.   If the driver identifies any safety problems or concerns, he must immediately report the problem to a UPS mechanic, who must sign off on any documented problem before that vehicle is permitted on the road.

**5**

### D.   The Days Leading up to Frazier's March 29, 2001 Discharge

Over a three day period in late March 2001, Plaintiff was assigned to drive a feeder truck (consisting of a tractor, in which the driver sits, and a trailer, which holds the cargo) from Fresno to San Fernando and back.  His shift began at 8:00 p.m. and ended the following morning.  On the evening of March 27, Frazier reported for work, picked up his assigned tractor (No. 204166) and performed the required pre-trip inspection of his equipment.  He did not report any problems with the equipment before he left Fresno.

At some point,[3] Frazier noticed that the "jake brake" on tractor 204166 was not working properly.  Shortly after Frazier left San Fernando to return to Fresno, he decided to return to San Fernando to address the problem.  In his deposition, Frazier explained the problem with the jake brake as follows:

> Q:   What problems were you having that caused you to turn around and go back.
>
> A:   First, I noticed the Jake brake wasn't working.  And then as I went on down further down the road...they held and then the truck made a loud noise and they kind of went - slid.  The brakes released and went down almost to the floor.  And from that period... I kept the truck in low gear and got it off the highway and turned around and brought it back to UPS.
>
> Q:   Did the brakes fail to work?
>
> A:   What they did was the didn't hold.  When I slowed the truck down, the brakes - they made a loud noise and the whole steering wheel just shook and then the pedal just went to the floor and I didn't have - the Jake brake was not working at this time either.  So that was - the pedal brake was the only way I had of stopping.

***

---

[3]   The timing of Frazier's discovery of the jake brake problem is not clearly set forth in the record.  He may have discovered the problem as he approached Los Angeles area on his way from Fresno to San Fernando, Frazier Depo., at 67, or just after Frazier left San Fernando to return to Fresno, *id*. at 36.

Q:   Did the brakes – pedal brakes slow the car – the truck
     down at this point?

A:   It slowed it down, but I had already had it in a gear
     to where the point where I was only going like 20 miles
     per hour.

Frazier Depo., at 33-34.  Frazier returned to San Fernando and
reported to problem to a UPS mechanic, Tom Wright.  Wright
inspected the brake and reported back to Frazier that he found no
mechanical problem.  Wright asked Frazier for more information
and then drove tractor 204166 around UPS's property at Frazier's
request.  Wright then told Frazier to drive another truck back to
Fresno (the "loaner truck").

     The next night, Frazier again reported for work in Fresno
and returned to San Fernando in the loaner truck.  In San
Fernando, Frazier took his original tractor (204166) for a test
drive and still believed there was something wrong with the jake
brake.  Frazier also thought there was a problem with another
part of the braking system:

          The pedal brakes, they were -- you can't drive around
          the yard too fast so they would work [there].  The
          handle did not hold.  When I pulled the handle, the
          test brake handle, the truck still rolled.

Id. at 73.  Frazier then had a conversation with Tom Wright who
told Frazier that he had not personally fixed the tractor but
that the day mechanics might have done so.  Frazier told Wright
"the Jake brake is [still] not working and I don't know if this
tractor is going to be – you said it was repaired, so I don't
feel safe in this tractor, so I'd rather return in the one I came
in."  Id. at 70.  Frazier was permitted to drive another loaner
truck back to Fresno.

On March 29, 2001, Don McWilliams, an automotive supervisor in San Fernando, personally inspected the brakes on tractor 204166 and performed a road test.  McWilliams found nothing mechanically wrong with the brake but did find that the switch on the jake brake worked intermittently.  McWilliams ordered mechanics to repair the switch.  After the repair, McWilliams determined that tractor 204166 was roadworthy.

When Frazier reported to work in Fresno on the night of March 29, a supervisor, Jim Wood, informed Frazier that his tractor 204166 had been repaired and was safe to drive.  Wood instructed Frazier to return the loaner truck to San Fernando and drive tractor 204166 back to Fresno.  Frazier told Wood that he would do so as long as 204166 passed his pre-trip safety inspection.  According to Frazier, Wood then instructed Frazier to bring the truck back regardless of the result of Frazier's safety inspection.  Frazier requested a union representative to join the discussion with Wood.  Wood apparently repeated his instructions.  Frazier again refused, apparently unwilling to give up his right to perform a safety check.  Wood then informed Frazier that he would be discharged for insubordination.

On March 30, 2001, UPS issued a discharge letter to Frazier confirming his termination for insubordination.  That night, another driver picked up Frazier's truck and drove it back to Fresno.  According to that driver's report, the truck "was fine" and had "no problems."  (According to Frazier, the driver also reported that the Jake brake and spring brake were not working properly.)

### E.    The Days Following Frazier's Discharge

Frazier was instructed by his union representative to wait for a phone call from UPS.  On April 5, 2001, Wood attempted to contact Frazier by telephone to inform him that he should report to work during his "working discharge' while the union grieved his termination.  According to Wood, no one answered, so Wood left a message on Frazier's answering machine.  (Frazier claims that he did not even own an answering machine.)  Wood informed Pete Nunez, Frazier's shop steward, of the termination.  Nunez told Wood he would attempt to contact Frazier.  Frazier did not report to work.

After twelve days without any contact from Frazier, UPS issued another discharge letter to Frazier, dated April 17, 2001, for job abandonment.  Frazier received the letter, but did not contact anyone at UPS.

### F.    Outcome of the Grievance Process

After his discharge, the Teamsters filed a grievance on Plaintiff's behalf.  A local review was convened, but Frazier never showed up.  On October 3, 2001, the LMC held a hearing regarding Frazier's discharge.  Frazier was informed of the hearing and expressed his intention to attend, but again did not show up.  The LMC upheld the legitimacy of the discharge.

### G.    Other Alleged Acts of Discrimination

Plaintiff believes he was disciplined on many occasions while non-African American UPS employees were not punished for similar conduct.  Frazier's only evidence of this alleged discrimination is his own deposition testimony.  Frazier's allegations of can be summarized as follows.

When asked to recall "every instance in which you believe
Mr. Wood harassed you because of your race," Frazier spoke of one
instance when he "was sitting at the back of the building doing
the same things that my Caucasian counterparts was doing, except
that they were in the front sitting with Jim Wood most of the
time or Larry McElhenie, and I was waiting for my doors."  On
that day, Frazier received a disciplinary letter for failure to
follow instructions.  Apparently, Frazier failed to hook his
tractor up to a trailer and failed to have the equipment ready in
front of the loading dock.  When Frazier told Wood and another
manager that he thought this was discrimination, Wood allegedly
said "he didn't want to hear anything [Frazier] had to say."
Frazier Depo., at 267-69.  Frazier recalled that his Caucasian
counterparts were often congregating in groups to "just stand
there and talk" when they "couldn't" possibly have hooked up
their tractor and trailer.  *Id*. at 273 (emphasis added).  Frazier
does not argue that he had personal knowledge that his Caucasian
counterparts actually did fail to follow instructions, he only
assumed that they could not have done so.

Frazier described an incident in which he received a day
suspension for using foul language over the phone even though he
was not "on the clock."  *Id*. at 268.  Frazier implied that other,
Caucasian, employees used similar language but were never
disciplined.  Frazier, however, provides no specific examples.

In 1999, Frazier was involved in an accident.  UPS
determined that he was at fault and discharged him.  *Id*. at 157-
58.  The police report of the accident concluded that Frazier was
not at fault.  *Id*.  According to Frazier, a "non-African-American

**10**

employee [] had an accident around the same time...and he never received a suspension or anything."  Id. at 165.

On another occasion, a new manager, Mr. Dugan, refused to allow Frazier to "float" (i.e., to help out on regular UPS delivery routes as necessary).  Dugan told Frazier that "he did not have a problem with [Frazier" but that Frazier had a "red flag" associated with his employment record.  Dugan, however, made no comments about Frazier's race.  Frazier Depo., at 292-294. Frazier also alleged that Dugan had "harassed him" but Frazier asserted that this "harassment" was retaliation against him for the accident Frazier had been in, implying that it had nothing to do with his race.

Frazier alleges that a supervisor at UPS's Logan Park Center, Mr. Barsarian, at one time stated that he did not like Oakland "because there's too many guys like you there." *Id*. at 186.  Frazier contends that this is (at least impliedly) a racially derogatory comment.

Finally, Frazier claims that he was given more work than one of his Caucasian counterparts, but does not provide any details with which to compare his workload to that of his counterpart. *Id*. at 317.

### IV.   <u>STANDARD OF REVIEW</u>

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  Therefore,

to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.* A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986). The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996). Nevertheless, the

evidence must be viewed in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

## V. **ANALYSIS**

### A. **Preemption by Section 301 of the LMRA**

In the April 16, 2003 order denying Plaintiff's motion to remand this case to state court, Magistrate Judge O'Neill concluded that Plaintiff's defamation claim was preempted by Section 301 of the LMRA, creating a valid basis for federal jurisdiction over the remainder of this suit. Defendants now argue that <u>all</u> of Plaintiff's claims, including the defamation claim, should be <u>dismissed</u> because they are preempted by § 301.

Section 301 of the LMRA provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....

29 U.S.C. § 185(a). In a series of cases, the United States Supreme Court determined that this provision preempts state law claims that are substantially dependent upon analysis of the terms of a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). "In enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962).

13

[T]he subject matter of § 301(a) is peculiarly one that calls for uniform law. The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation ... [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

*Id.* at 103-104 (internal citations and quotations omitted).

### 1.   Preemption of the Defamation Claim

The question of whether Plaintiff's defamation claim is preempted was resolved by Magistrate O'Neill's April 16, 2003 order.  No review of that order was sought.  The order acknowledged that "LMRA section 301 does not preempt every dispute concerning employment or tangentially involving collective bargaining agreement, and for instance, state rules proscribing conduct or establishing rights and obligations independent of a labor contract are not permitted."  Doc. 25 at 9.  However, where a defamation claim is "based on facts inextricably intertwined with the grievance machinery of the collective bargaining agreement" such a claim is preempted by § 301.  *Id.* at 11.  Magistrate O'Neill then correctly concluded that Plaintiff's complaint in this case "arises from the March 30 and April 17 discharge letters which the CBA required UPS to issue.  Resolution of whether Plaintiff was insubordinate when he refused to drive his vehicle requires review and interpretation

**14**

of the CBA, which addresses when an employee may refuse to drive an allegedly unsafe vehicle.  The facts presented by Plaintiff to date are linked to the CBA...."  *Id.*

Plaintiff did not move for reconsideration of this finding and, to the extent that he attempts to do so now, his objections are untimely.  *See* L.R. 72-303(b)("Rulings by Magistrate Judges shall be final if no reconsideration thereof is sought from the Court within ten (10) court days calculated from the date of service of the ruling on the parties.").  The April 16, 2003 order is the law of this case.  Although "[t]he law of the case doctrine is not an absolute bar to reconsideration of matters previously decided," a court may only reconsider "previously decided questions in cases in which there has been an intervening change of controlling authority, new evidence has surfaced, or the previous disposition was clearly erroneous and would work a manifest injustice."  *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995).  Plaintiff has made no such showing in this case.  To the contrary, Plaintiff appears to concede that this claim is preempted.  *See* Doc. 59 at 5-6.

Finding a claim preempted does not necessarily end the claim.  When a state claim is preempted by LMRA § 301, "that claim must either be treated as a § 301 claim...or dismissed as pre-empted by federal labor-contract law."  *Allis-Chalmers,* 471 U.S. at 220-221.  A claim "treated as a § 301 claim" must nevertheless be dismissed if the plaintiff failed to "make use of the grievance procedure established in the collective-bargaining agreement."  *Id.*

15

Defendant suggests, without clearly articulating facts to support its assertion, that Plaintiff failed to follow the grievance procedures set forth in the CBA between UPS and the Teamsters union.   It is not disputed that the CBA sets forth a grievance process for employees on "working discharges."   Once the union files a grievance on behalf of the employee, the employee, a union representative, and UPS managers meet in a "local review" to discuss the discipline.   If the matter is not resolved, it is referred to the LMC for a hearing.   It is not disputed that Plaintiff did not attend either the local review or the LMC hearing regarding his discharge.

UPS is entitled to summary judgment on Plaintiff's defamation claim.   Under the law of the case, the claim is preempted.   If treated as a § 301 claim, it is legally barred because Plaintiff failed to follow the dispute resolution procedures established in the CBA.   Even absent preemption, the allegedly defamatory statement concerned Plaintiff's performance on the job.   UPS had a duty to comment on that subject under the CBA and its comments are privileged.   Cal. Civ. Code § 47(c).

### 2.   Preemption of Plaintiff's Other Claims

Although Section 301's preemptive reach extends beyond contract claims to state tort actions, such as defamation, *e.g., Allis-Chalmers Corp.*, 471 U.S. at 220 (state tort action for bad faith handling of insurance claim preempted by LMRA), certain state law discrimination, retaliation, and wrongful discharge in violation of public policy claims are not necessarily preempted. *See Ramirez v. Fox Television Station, Inc.,* 998 F.2d 743, 748 (9th Cir. 1993).   This is because "[i]n the typical case a state

**16**

tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the 'just cause' language of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 412-413 (1988).  A state-law claim is preempted, however, "if the resolution of a state-law claim *depends upon the meaning of a collective-bargaining agreement*." *Id.* at 405-406 (emphasis added).

In the Ninth Circuit, "state-law causes of action are preempted [by § 301] if they are either based upon a collective-bargaining agreement or dependent upon an interpretation of the agreement," while "[c]auses of action that only tangentially involve a provision of a collective-bargaining agreement are not preempted....[n]or are causes of action which assert nonnegotiable state-law rights independent of any right established by contract." *Ramirez*, 998 F.2d at 748.  One example of a nonnegotiable state-law right that is independent of any contractual right is the right to be free from discrimination on the basis of race.  *See Id*.

A claim is *not preempted* by § 301 if it simply demands *reference to* the provisions of a CBA; only when the resolution of a claim requires *interpretation of* the CBA is the claim preempted.  *See Beals v. Kiewit Pac. Co., Inc.*, 114 F.3d 892, 895 (9th Cir. 1997)(where "none of the terms of the CBA relevant to [plaintiff's] claim is subject to conflicting meanings, resolution of that claim will not contravene the policy behind § 301 preemption to 'ensure uniform interpretation of collective-bargaining agreements'."); *Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers*, 109

**17**

F.3d 1353, 1357 (9th Cir. 1997)("To effectuate the goals of § 301 [preemption] it should be applied only to state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, and to tort suits which allege breaches of duties assumed in collective bargaining agreements.").

In *Jimeno v. Mobile Oil Corp.*, 66 F.3d 1514, 1524, 1527 (9th Cir. 1995), state regulations required employers to accommodate disabled employees; the CBA did not address the issue at all. Similarly, in *Ramirez*, the terms of the CBA were not in dispute because the plaintiff claimed that the provisions of the CBA were being applied in a discriminatory manner.  998 F.2d at 749.

However, in *Audette v. Int'l Longshoremen's Warehousemen's Union, Local 24*, 195 F.3d 1107, 1110 (9th Cir. 1999) plaintiffs alleged that a labor union defendant breached the terms of a settlement agreement by denying them the opportunity to register as members of a particular class of workers under the union's CBA.  This claim was preempted by § 301 because (1) the settlement provided that registration could be denied if the union had a legitimate business purpose for doing so (2) and determining whether there was any legitimate reason for refusing registration would require interpretation of terms in the CBA "such as provisions for the expansion of the Voluntary Travel provision under the CBA...the policy of transferring workers from Limited Work Opportunity ports, and the authority [] under the CBA to limit the number of workers in each category to conform to the volume of available work."  *Id*. at 1112.  Consequently, the

1   breach of settlement agreement claim was found to be preempted.

2   The *Audette* plaintiffs also claimed that the union's actions

3   constituted sex discrimination in violation of Washington law.

4   The court concluded that this claim was also preempted because:

> The instant [claim] does not involve a free-standing
> claim of discrimination. Rather, the claim turns on
> whether defendants' alleged failure to perform the
> settlement agreement was motivated by retaliation or
> discrimination. Under Washington discrimination law, an
> employer or union can refute a prima facie case of
> discrimination by offering a legitimate
> nondiscriminatory reason for their employment decision.
> Here, resolution of the discrimination and retaliation
> claim turns on defendants' offer of a "legitimate
> nondiscriminatory reason" requiring interpretation of
> the collective bargaining agreement....Accordingly,
> this claim is preempted.

12  *Id*. at 1113.

13      Similarly, in *Madison v. Motion Picture Set Painters and*

14  *Sign Writers Local 729,* 132 F. Supp. 2d 1244, 1254-55 (C.D. Cal.

15  2000), the plaintiff claimed, among other things, that the manner

16  by which the union handled his grievance was discriminatory, in

17  part because the grievance was not filed according to standard

18  procedure.  The court found this claim was preempted because its

19  resolution would require an inquiry into "whether the Union

20  followed the procedures set forth in the CBA for filing such a

21  grievance and whether, under the provisions of the CBA, the

22  grievance had merit."  *Id*. at 1255

23      Here, UPS makes several arguments the resolution of which

24  might depend upon the meaning and application of the

25  collective-bargaining agreement.  For example, UPS argues that

26  Frazier did not suffer an "adverse employment action" (a prima

27  facie element of Plaintiff's termination-related claims) because

28  under the CBA he was entitled to return to work during the

**19**

grievance process.   Also UPS offers a nondiscriminatory reason for Plaintiff's termination, the evaluation of which in fact depends upon the interpretation of the CBA and its application to the grievance procedure.   Because resolving the preemption issue requires some inquiry into the merits of each claim and because UPS argues in the alternative that it is entitled to judgment on the merits of all of Plaintiff's claims, whether each claim is preempted by § 301 of the LMRA is discussed with an analysis of the merits.

**B.   Discharge in Violation of Public Policy on Worker Safety**

**1.   Prima Facie Case and California Public Policy Concerning Worker Safety.**

In *Tameney v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980), the California Supreme Court established a cause of action for wrongful terminations that violate public policy.   In order to establish a prima facie case of retaliatory discharge in violation of public policy, Plaintiff must show that (1) he engaged in a protected activity, (2) that his employer subjected him to adverse employment action, and (3) that there is a causal link between the protected activity and the employer's action. *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992)

In order to support a wrongful termination claim, a "public policy" must be "(1) delineated in either constitutional or statutory provisions; (2) public in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *City of*

*Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159

(1998)(internal citations omitted).

Two provisions of the California Labor Code, found within a Division of the Code concerning "Occupational Safety and Health," are relevant to the issues here.  Section 6310(a)(1), entitled "Retaliation for filing a complaint prohibited," provides:

> No person shall discharge or in any manner discriminate against any employee because the employee has...[m]ade any <u>oral or written complaint to</u> the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, <u>his or her employer</u>, or his or her representative.

(emphasis added).  Section 6311, entitled "Retaliation for refusing to work in violation of health and safety standards" provides:

> No employee shall be laid off or discharged for refusing to perform work in the performance of which this code, including Section 6400, any occupational safety or health standard or any safety order of the division or standards board will be violated, where the violation would create a real and apparent hazard to the employee or his or her fellow employees....

### 2.   Unraveling Plaintiff's Claim

The contours of Frazier's public policy wrongful discharge claim are not entirely clear.  Plaintiff appears to set forth two bases for liability.  First, Plaintiff asserts that he was fired because he refused to give up the right to perform a pre-trip inspection of his truck.  Second, Plaintiff asserts that he "engaged in the protected activity of protesting an unreasonable order to engage in work which [he] reasonab[y] believed involved a risk of serious injury or death to himself and the public by use of an unsafe vehicle on public highways."  Doc. 59 at 13.

1

**3.    Plaintiff's claim based on his alleged right to perform a pre-trip inspection of his tractor is preempted.**

2

3      Plaintiff's first ground for liability -- that he was fired

4 because he refused to give up his right to perform a pre-trip

5 safety inspection -- is not a right that is grounded in a "public

6 policy." Plaintiff points to no statute, regulation, or rule

7 that requires pre-trip inspection of vehicles by an driver as a

8 matter of right. Rather, the right has its origins in the CBA

9 and nowhere else. It is therefore subject to preemption because

10 it is "based on the collective bargaining agreement." *Ramirez*,

11 998 F.2d at 748. Because Plaintiff did not pursue the remedies

12 available to him under the CBA, he may not advance this claim as

13 one brought under § 301. UPS's motion for summary adjudication

14 as to Plaintiff's allegation that he was terminated in violation

15 of public policy for refusing to give up his "right" to perform a

16 pre-trip inspection is **GRANTED.**

17

18

*4.    Plaintiff's claim based on his right to refuse to work under allegedly unsafe conditions.*

19

20      Plaintiff's second ground for liability is that he was

21 discharged because he refused to work under unsafe conditions.

22 UPS argues that it is entitled to summary judgment on this claim

23 because: (1) Frazier never engaged in any conduct protected by

24 the public policy of California; (2) UPS took no adverse action

25 against Frazier; and (3) the claim is preempted by § 301.

26 //

27 //

28 //

22

1

### a.   Protected Conduct

2      The right to refuse to work under unsafe conditions is

3 arguably a right protected by California public policy.  Frazier

4 does not claim he was terminated for "complaining" about safety

5 to anyone at UPS or elsewhere, rendering California Labor Code

6 § 6210 inapplicable.  Rather, Frazier alleges that he was

7 terminated for refusing to perform his duties because he believed

8 Tractor 204166 posed a safety hazard.  Based on Plaintiff's

9 alleged facts, Section 6311 of the California Labor Code,

10 concerning retaliation for refusing to work appears most

11 relevant:

12              No employee shall be laid off or discharged for
               refusing to perform work in the performance of which
13             this code, including Section 6400, any occupational
               safety or health standard or any safety order of the
14             division or standards board will be violated, where the
               violation would create a real and apparent hazard to
15             the employee or his or her fellow employees.

16 Cal. Lab. Code § 6311.  UPS argues that Frazier has failed to

17 prove that the alleged safety problems with Tractor 204166

18 violated any safety standard or that the problems "create a real

19 and apparent hazard."  In response, Plaintiff points to *Hentzel*

20 *v. Singer*, 138 Cal. App. 3d 290, 299-300 (1982) and *Freund v.*

21 *Nycomed Amersham*, 347 F.3d 752, 758-759 (9th Cir. 2003).  Both of

22 these cases held that <u>§ 6310</u> not only prohibits retaliation

23 against those who report <u>actual</u> dangers but also those who in

24 "good faith" report working conditions they "reasonably believe"

25 to be unsafe.  But *Hentzel* strongly suggests that <u>§ 6311</u> should

26 be interpreted differently, because § 6311 "protects the more

27 drastic conduct of refusing to work only where some occupational

28

safety or health standard or any safety order of the division of standards board will be violated." 138 Cal. App. 3d at 399.

UPS witnesses acknowledge that the jake brake is a safety device, but insist that it is a not necessary and is not required by the Department of Transportation ("DOT"). Wood Depo., at 92:16-19. Michael Hoffrage, the driver who eventually returned tractor 204116 to Fresno, reported that "the jake brake didn't work properly on the highest setting," but added that the jake brake was a "luxury item" and that tractors are designed to "do without the jake brake." Hoffrage Depo., at 34. Plaintiff does not contradict these assertion. If the jake brake was the only potential safety problem with Tractor 204166, this claim might fail. But Frazier also claims problems with the "spring brake" on Tractor 204166, Frazier Depo., at 73, a problem that was confirmed by Hoffrage. Hoffrage Depo., at 51, 53. It is not disputed that a "spring brake" is required safety equipment. Johnson Depo., 97. Although it is a close call, a trier of fact could reasonably conclude that a malfunctioning spring brake (either alone or in conjunction with a malfunctioning jake brake) violated a safety standard and created a real and apparent hazard.

UPS also argues that Plaintiff cannot establish the "protected conduct" element of a prima facie case "because safety inspections were part of his job." UPS cites *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996) to support this contention. In *McKenzie*, a personnel director did not engage in protected activity when she brought potential

**24**

1 violations of employment law to the attention of her employer,

2 because it was her job to identify such risks.[4]   The Tenth

3 Circuit reasoned:

> [Plaintiff] never crossed the line from being an
> employee merely performing her job as personnel
> director to an employee lodging a personal complaint
> about the wage and hour practices of her employer and
> asserting a right adverse to the company.

7 *Id.* at 1486.  Frazier admits that one of his job duties was to

8 perform safety inspections on his vehicle and identify potential

9 safety problems.  UPS argues that Frazier, like the plaintiff in

10 McKenzie, was merely doing his job, not engaging in protected

11 conduct.  But Frazier did assert a right adverse to the company –

12 he refused to obey an order because he was concerned about the

13 safety of his vehicle.  Frazier engaged in protected conduct.

14

15                           **b.   Adverse Action**

16      UPS argues that it took no adverse action against Frazier;

17 rather, Frazier failed to show up for work during his "working

18 discharge."  The discharge letter issued to Frazier after he

19 refused to return Tractor 204166 from San Fernando to Fresno

20 states:

21 //

22 //

23 //

24 //

25

26

27      [4]     UPS also cites *Roberston v. Bell Helicopter Textron*,
Inc., 32 F.3d 948, 952 (5th Cir. 1994), which is not on point, as
28 it interprets the meaning of "protected activity" under the False
Claims Act.

1    March 30, 2001.

2    Thomas Frazier
     [Address]
3
     Dear Thomas:
4
     This is a discharge letter for insubordination, issued
5    to Thomas Frazier, who is presently employed as a
     service provider in our Logan Park Center
6
     On March 27, 2001, you had a breakdown in L.A.  The
7    tractor was repaired and I instructed you to exchange
     the tractor out.  You refused to drive tractor # 204166
8    saying it was unsafe to drive.  You went to get an
     hourly to be a witness.  I informed you that refusing
9    to exchange the vehicle was gross insubordination and
     grounds of [sic] termination and asked if you
10   understood this to which you replied yes, and still
     refused to drive the tractor.  I then proceeded to
11   terminate you in the presence of the witness.

12   Therefore, it is my decision to discharge you, per
     Article 7, Section 4, of the Northern California
13   Package Rider.

14   Respectfully,

15   John Acha
     Sequoia Division Manager
16
     cc:  Mr Pete Nunez, Teamsters Local 431
17        Human Resources Department

18
19   Even without referencing the CBA, this letter is, on its face, an

20   adverse employment action.  The referenced provision of the CBA

21   (Article 7) provides:

22        Except in cases involving cardinal infractions under
          the applicable Supplement, Rider or Addendum, an
23        employee to be discharged or suspended shall be allowed
          to remain on the job, without loss of pay unless and
24        until the discharge or suspension is sustained under
          the grievance procedure.

25   Doc. 17, filed Jan. 30, 2003, Ex. 1 Art. 7.  According to this

26   language, Frazier was permitted to remain on the job so that he

27   could continue receiving pay as the grievance process progressed.

28   There is no language in the CBA that calls into question the

26

effect of a discharge letter: termination pending the completion of the grievance process.  The letter operated as an adverse employment action.

### c.   Preemption

Although the CBA does address safety and safety inspections, the critical question is whether UPS violated California Labor Code § 6311.  This question can be resolved without interpreting the terms of the CBA.  To the extent that UPS impliedly argues that Frazier's termination was justified under the CBA for insubordination and job abandonment, the meaning of the operative terms of the CBA are not in dispute.  Moreover, although the first termination letter sent to Frazier makes reference to the CBA, it is not necessary to interpret the CBA to conclud that the letter constitutes an adverse action.

In sum, because Plaintiff's wrongful discharge claim is grounded in California public policy and the resolution of the claim does not demand interpretation of the CBA's terms, the claim is not preempted by § 301 of the LMRA.  Plaintiff's wrongful discharge discrimination claim survives, and UPS's arguments to the contrary are rejected.  Accordingly, UPS's motion for summary judgment on Plaintiff's wrongful discharge claim is **DENIED**.

### C.   <u>Discriminatory Discharge Claim</u>

Frazier also alleges that UPS discharged him because of his race.  This claim is brought under California's Fair Employment and Housing Act (FEHA), Cal. Gov. Code § 12940, which provides:

**27**

1

2

3

> It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

4

5

6

7

8

9

> (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

10    In FEHA claims, California courts apply the familiar burden

11  shifting approach established in *McDonnell Douglas Corp. v.*

12  *Green,* 411 U.S. 792, 802 (1973).  *See Guz v. Bechtel Nat. Inc.,*

13  24 Cal. 4th 317, 354 (2000) ("Because of the similarity between

14  state and federal employment discrimination laws, California

15  courts look to pertinent federal precedent when applying our own

16  statutes.").  Under the *McDonnell Douglas* approach, Plaintiff

17  must first establish a prima facie claim.

18

19

20

21

22

23

24

> This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled.  While the plaintiff's prima facie burden is not onerous, he must at least show  actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion.

25  *Guz*, 24 Cal. 4th at 354 (internal citations and quotations

26  omitted).  The specific elements of a prima facie case vary,

27  depending on the particular facts and circumstances:

28

**28**

> Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Id.* (internal citations and quotations omitted).[5]

If Plaintiff is able to establish a prima facie case, the analysis continues:

> Establishment of the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

*Mixon*, 192 Cal. App. 3d at 1318-19 (citing *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  If defendant provides evidence showing a legitimate non-discriminatory reason for the termination:

---

[5]   Defendant suggests the adoption of an ADA-like prima facie standard that would require Plaintiff to show he (1) is a member of a protected class, (2) he suffered an adverse employment action, and (3) he was <u>qualified for the job</u>.  But, the more general standard articulated in *Guz* is the law. Plaintiff may meet that standard in a number of ways.  For example he may establish a prima facie case of discriminatory discharge by showing that (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged or suffered some other adverse employment action; and (4) others not in the protected class were treated differently.  *See Mixon v. Fair Employment & Hous. Com.,* 192 Cal. App. 3d 1306, 1318 (1987).

> [T]he presumption raised by the prima facie case is
> rebutted, and the factual inquiry proceeds to a new
> level of specificity....Plaintiff now must have the
> opportunity to demonstrate that the proffered reason
> was not the true reason for the employment decision. He
> may succeed in this either directly by persuading the
> court that a discriminatory reason more likely
> motivated the employer or indirectly by showing that
> the employer's proffered explanation is unworthy of
> credence.  This burden now merges with plaintiff's
> ultimate burden of persuading the court that he has
> been the victim of intentional discrimination.  At this
> stage, the *McDonnell/Burdine* presumption "drops from
> the case" and the factfinder must decide upon all of
> the evidence before it whether defendant intentionally
> discriminated against plaintiff. *In short the trier of
> fact decides whether it believes the employer's
> explanation of its actions or the employee's.  While a
> complainant need not prove that racial animus was the
> sole motivation behind the challenged action, he must
> prove by a preponderance of the evidence that there was
> a "causal connection" between the employee's protected
> status and the adverse employment decision.*

*Id.* (internal citations and quotations omitted).

### 1.   Prima Facie Elements

*Guz* establishes that Plaintiff's prima facie burden is not

onerous.  He must, at a bare minimum, provide evidence that (1)

he was a member of a protected class, (2) he was qualified for

the position he sought or was performing competently in the

position he held, (3) he suffered an adverse employment action,

such as termination, demotion, or denial of an available job, and

(4) some other circumstance suggests discriminatory motive.   It

is not disputed that Plaintiff satisfies the first element

because of his race.

30

### 2.   Qualification/ Satisfactory Performance

UPS asserts Frazier should not be considered "qualified" because he failed to show up for work during his "working discharge."  Frazier's failure to return to work was <u>preceded by</u> an adverse action -- the issuance by UPS of the March 30, 2001 letter discharging Frazier for insubordination.  The relevant question is, therefore, whether Frazier was performing his job in a satisfactory manner <u>before</u> the issuance of the discharge letter.  Although Frazier has a long disciplinary history and could be characterized as a "problem" employee, UPS has not provided evidence that any of these prior incidents had a bearing upon Frazier's performance in March 2001.

### 3.   Adverse action

The March 30, 2001 letter sent by UPS to Frazier is an adverse action that preceded Frazier's failure to return to work.

### 4.   Circumstantial evidence of discriminatory motive.

Plaintiff's evidence of discriminatory motive is entirely anecdotal.  Frazier describes several incidents in which he was disciplined for certain types of conduct.  In Frazier's opinion, other Caucasian employees were not disciplined for similar conduct.  For example, Frazier believes he was disciplined for

failing to hook up his tractor while his Caucasian counterparts "couldn't" possibly have completed this task.  Frazier Depo., at 273.  Frazier contends that he received a day suspension for using foul language over the phone, while other, Caucasian employees used similar language but were never disciplined.  *Id*. at 268.  Frazier also alleges that a supervisor at UPS's Logan Park Center made a racially derogatory remark by stating that he did not like Oakland "because there's too many guys like you there."  *Id*. at 186.

Frazier does provide one more specific example of allegedly discriminatory treatment.  In 1999, Frazier was involved in an accident.  UPS determined that Frazier was at fault and discharged him, even though a police report concluded that Frazier was not to blame.  *Id*. at 157-58.  According to Frazier, a "non-African-American employee [] had an accident around the same time...and he never received a suspension or anything."  *Id*. at 165.

Plaintiff's evidence of discriminatory motive is sufficient to raise a disputed issue because "the burden of establishing a prima facie case of disparate treatment is not onerous."  *Guz, 24 Cal. 4th at 354*.

//

//

### 5.  Legitimate Non-Discriminatory Reason for Termination

Once Plaintiff establishes a prima facie case, the burden then shifts to Defendant.  UPS insists that it decided to terminate Frazier for legitimate, non-discriminatory reasons, namely insubordination and job abandonment, rather than because of his race.  Specifically, UPS asserts that Frazier's refusal to drive Tractor 204166 home from San Fernando was willful insubordination and that his subsequent failure to return to work during his "working discharge" is grounds for dismissal for job abandonment.

Frazier admits to many of the relevant facts in his own deposition.  On March 29, 2001, Jim Wood informed Frazier that Tractor 204166 had been repaired and instructed Frazier to pick up the tractor from San Fernando and return with it to Fresno.  Frazier Depo., at 78, 127.  Frazier refused this order, and Wood then terminated him for insubordination.  *Id.* at 110-111. Although Frazier insists that his refusal was justified, "the defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Mixon*, 192 Cal. App. 3d at 1318-1319.  Defendant's showing is adequate at this stage. //

### 6.   Plaintiff's Showing of Pretext

Once defendant provides evidence showing a legitimate non-discriminatory reason for the termination:

> [Plaintiff] now must have the opportunity to
> demonstrate that the proffered reason was not the true
> reason for the employment decision. [He] may succeed in
> this either directly by persuading the court that a
> discriminatory reason more likely motivated the
> employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence.

*Id.* at 1318.  Frazier has presented circumstantial evidence that
race motivated UPS's decision.  *See supra* § V.C.4 (circumstantial
evidence of discriminatory motive).  Frazier's evidence can also
be interpreted to show that UPS's proffered explanation for
terminating Frazier is "unworthy of credence."  Frazier insists
that he refused to follow Wood's orders because Tractor 204166
had persistent safety problems that UPS mechanics repeatedly
failed to resolve.  Frazier's safety concerns are documented in
the safety log for Tractor 204166 and confirmed by Mr. Hoffrage,
the driver who did end up returning Tractor 204155 from San
Fernando.

The Ninth Circuit provides somewhat conflicting guidance on
the quality and quantity of pretext evidence required for a
plaintiff to survive summary judgment.  *McGinest v. GTE Service
Corp.,* 360 F.3d 1103, 1124 (9th Cir. 2004) reaffirmed the rule
that:

> [V]ery little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive...may suffice to raise a question that can only be resolved by a fact-finder.  When the evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason....Such uncertainty at the summary judgment stage must be resolved in favor of the plaintiff. [Where a number of] factors cast doubt upon [defendant's] proffered explanation for its failure to promote [plaintiff], while providing support for his contention regarding racial discrimination, [plaintiff] has met his burden of showing a genuine factual issue with regard to discriminatory intent.

*See also Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) ("[W]e have held that any indication of discriminatory motive... may suffice to raise a question that can only be resolved by a factfinder, and for that reason summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination."). Frazier's proof in this case amply satisfies the above standard.

*Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003) delineates a more stringent requirement when a plaintiff's proof is largely circumstantial:

> When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. In contrast, when direct evidence is unavailable...and the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, we require specific and substantial evidence of pretext to survive summary judgment.

(internal citations and quotations omitted).

Although *Stegall* sets a higher bar, at least some of Frazier's evidence can be described as "specific" and "substantial."   In particular, Frazier's testimony regarding the brake problems and his refusal to drive Tractor 204166. Frazier's version of events, which cannot be found incredible on summary judgment, calls UPS's proffered bases for his termination into doubt.   "Proof that the defendant's explanation is unworthy of credence is a form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *McGinest*, 360 F.3d at 1124 (*citing Reeves v. Sanderson Plumbing Prod.*, Inc., 530 U.S. at 133, 147 (2000)). The Ninth Circuit has found that deviations from an employer's regular procedures provide evidence of discrimination powerful enough to overcome a motion for summary judgment.  *See Porter v. Cal. Dept. of Corr.*, 383 F.3d 1018, 1026-27 (9th Cir. 2004). Here, Frazier's description of the events suggests that UPS refused to allow him to follow regular safety procedures.   There is also a dispute about whether the employer recalled him to work, as he had no answering machine.   Plaintiff's evidence is specific and strong enough to show pretext.

//

//

//

**7.   Summary Judgment is Inappropriate on this Claim**

Because Plaintiff met his burden of showing pretext "the *McDonnell/Burdine* presumption drops from the case and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff":

> In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's.  While a complainant need not prove that racial animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision.

*Mixon*, 192 Cal. App. 3d at 1318.  On summary judgment, this determination must be left to a jury if there are disputed issues of material fact.  Here, the lawfulness of UPS's termination decision turns in part on the legitimacy of Frazier's refusal to follow instructions.  Whether a "jake brake" is, as Frazier maintains, an important piece of safety equipment, or, as UPS insists, a "luxury" item is disputed, as is whether another part of the braking system did not function.  In addition, Frazier's anecdotal evidence of discriminatory treatment over time raises factual issues that cannot be resolved on summary judgment.

//

//

//

37

**8.    This claim is not Preempted; Analysis of the Proffered Legitimate Nondiscriminatory Basis for Termination Does Not Require Interpretation of the CBA.**

UPS maintains that any inquiry into UPS's proffered nondiscriminatory basis for terminating Frazier will demand an interpretation of the CBA.   The CBA provides in pertinent part:

> The Employer shall not require employees to take out on the street or highways any vehicle that is not in a safe operating condition or not equipped with the safety appliances prescribed by law. <u>It shall not be a violation of the Agreement where employees refuse to operate such equipment unless such refusal is unjustified</u>....
>
> * * *
>
> Employees shall immediately, or at the end of their shifts, report all defects of equipment on a suitable form furnished by the Employer. The Employer shall not ask or require any employee to take out equipment that has been reported by any other employee as being in an unsafe operating condition until same has been approved as being safe by the automotive maintenance department. (NCSA, Art. 11, § 2)

(emphasis added).

Although UPS's proffered nondiscriminatory reason for terminating Frazier could trigger the operation of these sections of the CBA, <u>there is no suggestion by UPS that the meaning of any of its terms are in dispute</u>.   The CBA plainly states that "[i]t shall not be a violation of the Agreement where employees refuse to operate such equipment unless such refusal is unjustified."   In determining the legitimacy of UPS's nondiscriminatory basis for terminating Frazier, one important question will be whether

38

Frazier's refusal to drive his tractor was <u>justified under the circumstances</u>.  The CBA gives some guidance as to when an employee's refusal would be justified:

> It shall not be a violation of this Agreement, or cause for disciplinary action, where employees refuse to operate equipment or a vehicle <u>when such operation constitutes a violation of any state or federal rules, regulations, standards or orders applicable to commercial motor vehicle safety or health, or because of the employee's reasonable apprehension of serious injury to himself/herself or the public due to the unsafe conditions as set out in any state or federal rules, regulations, standards or orders applicable to commercial motor vehicle safety or health to include Part 392.14 of the Federal Motor Carrier Regulations</u>. (NMUPSA, Art. 18, § 1)

But, critically, these provisions are clear and in need of no interpretation.  They provide unambiguous standards to which the facts, as found by the trier of fact, will be applied.

UPS's motion for summary judgment on Frazier's discriminatory termination claim is **DENIED**.


### D.    <u>Retaliation for Complaining about Race Discrimination</u>

Plaintiff also alleges that UPS retaliated against him for complaining about racial discrimination.[6]

---

[6]    Lawsuits claiming retaliatory termination in violation of FEHA are "analogous to federal Title VII claims, and are evaluated under federal law interpreting Title VII cases." *Flait,* 3 Cal. App. 4th at 475-76.

### 1.   Failure to Exhaust Administrative Remedies

At the outset, UPS argues that Frazier has failed to exhaust his administrative remedies with respect to any race-related retaliation claim because Frazier failed to file an administrative complaint of retaliation.  Frazier's EEOC complaint, dated January 3, 2002, states in its entirety:

> I was subjected to a hostile atmosphere culminating in discharge from my position as a Feeder driver. Respondent is a delivery service employing more than 500.

> I was subject to undue surveillance and harassment by supervisors and management which was not imposed on non-African American co-workers.  *Management tried to intimidate me when I objected*.

> During the week of March 26, 2001 I experienced a continuing mechanical problem with a truck that I repeatedly reported and attempted to have properly corrected.  Management ordered me to drive that hazardous truck, but I declined.  March 29, 2001 I was discharged.

> I believe I have been discriminated against because of my race (African American).

Frazier Depo., Ex. 9 (Gammon Decl., Ex. A) (emphasis added).  On its face, Frazier's complaint explains that he "was subject to undue surveillance and harassment by supervisors and management which was not imposed on non-African American co-workers" and that "*Management tried to intimidate [him] when [he] objected*."  With these statements, Frazier alleges having previously made complaints about discriminatory treatment and having been mistreated because of his complaints.  Although Frazier neglected

40

to use the legal catch-phrase "retaliation," "[t]he specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." *Baker v. Children's Hosp. Med. Ctr.,* 209 Cal. App. 3d 1057, 1064 (1989).

Even assuming the language in Frazier's complaint did not spell out a retaliation claim in lay terms,

> The allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination ***like or related to*** allegations contained in the [administrative] charge and growing out of such allegation during the pendency of the [administrative] case.... In other words, the scope of the judicial complaint is limited to the scope of the EEOC investigation which can ***reasonably be expected to grow out of the charge of discrimination***.

*Id.* (emphasis added). Here, a claim of retaliation could reasonably by expected to grow out of Frazier's complaint that "Management tried to intimidate" him for having "objected" to discriminatory treatment.

## 2.   Prima Facie Case of Retaliatory Discharge

In order to make out a prima facie case of retaliatory discharge, a plaintiff must show "[1] that he engaged in a protected activity, [2] his employer subjected him to adverse employment action, and [3] there is a causal link between the protected activity and the employer's action." *Flait,* 3 Cal. App. 4th at 476. As discussed above, Frazier's termination constitutes an adverse employment action.

### 3.   Protected activity

UPS denies that Frazier ever formally complained about race discrimination, while Frazier claims to have told UPS managers on many occasions that he felt he was being discriminated against because of his race.  Frazier Depo., at 300-301.  Frazier alleges that he made complaints of discrimination to Jim Wood three or four months before Wood made the decision to terminate Frazier on March 29, 2001.  Frazier Depo., 267-269.  Frazier also reported discriminatory treatment to other managers at UPS.  *Id*. at 300-302.  Finally, although Frazier never filed a formal written grievance concerning race discrimination, Frazier's complaints of race discrimination were discussed at a local review meeting that took place on March 29, 2001 (the day Frazier was terminated).  *Id*. at 376-79.  Frazier also discussed the subject with Pete Nunez, a union representative.  Nunez' allegedly responded, "Your always saying somebody is discriminating against you," *id*. at 302, inferentially confirming that Frazier had made more than one complaint.  Making an informal complaint can constitute protected activity.  *Passatino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000).

### 4.   Causation

UPS argues that Plaintiff cannot show a causal link between any discrimination complaint and his termination.  As explained

above, Frazier alleges that he complained about racial discrimination on many occasions to many people at UPS.  In addition Frazier emphasizes that his allegations of race discrimination were discussed at a local review that convened on the very day he was terminated by Jim Wood.  UPS insists that the only complaints that are relevant to the causation analysis are those about which Jim Wood had knowledge.  *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003)(requiring plaintiff to "make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity."); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

Frazier responds that he actually made complaints of race discrimination directly to Jim Wood "three or four months" prior to his termination.  "[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002).  Whether this three to four month lag time triggers an inference of causation presents a close question of law.  *Compare Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (prima facie case of causation established when discharges occurred forty-two and

fifty-nine days after plaintiff respectively attended EEOC hearings and signed agreements with employer); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)(causation existed where adverse action occurred less than three months after complaint was filed); *Flait*, 3 Cal. App. 4th at 478 (sufficient causal link where employee was terminated a "few months" after engaging in protected conduct) *with Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)(timing alone did not support claim of retaliation where almost two years passed from when the defendant must have known about plaintiff's protected activity until alleged adverse employment action); *Villiarimo,* 281 F.3d at 1065("nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation.").

Here, a lapse of three to four months occurred.  This period of a few months time arguably gives rise to an inference of causation under *Miller*, *Yartzoff*, and *Flait*.  However, several cases from outside the Ninth Circuit suggest otherwise.  *See Richmond v. ONEOK Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month period not sufficiently proximate); *Huhges v. Derwinski*, 967 F.2d 1168, 1171, 1174 (7th Cir. 1992) (four months between filing of complaint and receipt of disciplinary letter does not give rise to an inference of causation).  Notably, the Ninth Circuit cautions that a "specified time period cannot be a

**44**

mechanically applied criterion.  A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003).

The complaints Frazier made to Wood cannot be viewed in a vacuum.  Frazier asserts that he complained about race discrimination frequently to many individuals at UPS –– so much so that Pete Nunez exclaimed to Frazier that "You [are] always saying somebody is discriminating against you."  A reasonable juror could conclude from this evidence that Frazier's discriminatory treatment activity was constant and widely known.[7] (Whether Frazier was actually a victim of repeated discriminatory acts or is not being candid about his treatment is a matter for the finder of fact to determine.)

---

[7]      Frazier also argues that Wood "knew or should have known of the preceding local review involving Mr. Frazier and the matters discussed," Doc. 59 at 16, but offers no authority for the proposition that anything short of actual knowledge is adequate.  *Compare Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (holding "it is not sufficient that [defendant] could or even should have known about [plaintiff's] complaints; [defendant] must have had actual knowledge of the complaints for her decisions to be retaliatory.").  Moreover, Frazier offers no evidence to suggest that Wood should have been aware that the Local Review was taking place on March 29, 2001 or that Frazier engaged in any other protected conduct (apart from the complaints made directly to Wood) in close proximity to the date of his termination.

45

Frazier has established a prima facie case of retaliatory termination.  The *McDonnell Douglass* and preemption analysis performed in the context of Frazier's discriminatory termination applies with equal force to this claim.  UPS's motion for summary judgment on Frazier's retaliation claim is **DENIED**.

### E.    Other Potential Claims

Frazier's complaint appears to allege other forms of racial harassment unrelated to his termination.  Frazier concedes in his opposition that these claims are not independently actionable but may, instead, provide additional evidence of discriminatory intent.  Doc. 59 at 18.  UPS's motion for summary judgment on any claim of generalized discrimination unrelated to Frazier's employment is **GRANTED**.

### F.    Punitive Damages

Plaintiff's claims are all grounded in California law. California Civil Code § 3294(b), which governs the availability of punitive damages in claims brought against a corporate employer, provides:

> An employer shall not be liable for [punitive] damages
> ... based upon acts of an employee of the employer,
> unless the employer had advance knowledge of the
> unfitness of the employee and employed him or her with
> a conscious disregard of the rights or safety of others
> or *authorized or ratified* the wrongful conduct for

which the damages are awarded or was personally guilty
of oppression, fraud, or malice. With respect to a
corporate employer, the advance knowledge and conscious
disregard, authorization, ratification or act of
oppression, fraud, or malice _must be on the part of an
officer, director, or managing agent of the
corporation_.

(emphasis added).  Frazier alleges that his termination was

initiated by Jim Wood and then approved by Wood's supervisors,

Steve Johnson and John Acha.  None of these three men are alleged

to be officers or directors of UPS.  Frazier suggests, however,

that Johnson and/or Acha are "managing agents" of UPS.  In _White

v. Ultramar_, Inc., 21 Cal. 4th 563 (1999), the California Supreme

Court held that a manager who was responsible for eight

convenience stores and sixty-five employees was a managing agent

for purposes of § 3294(b).  The White court reasoned that section

3294(b) limited corporate punitive damage liability "to those

employees who exercise substantial independent authority and

judgment over decisions that ultimately determine corporate

policy." _Id_. at 573.  The critical factor "... is the degree of

discretion the employees possess in making decisions that will

ultimately determine corporate policy." _Id_. at 573.  Frazier has

presented absolutely no evidence that suggests Wood, Johnson, or

Acha possessed the degree of corporate discretion and authority

that would enable them to ultimately determine corporate policy

at UPS.  Rather, the evidence undisputably establishes that

Plaintiff was dealt with on a local basis by local supervisors at

47

one local terminal.   Plaintiff has failed to meet this basic

standard of proof.   Defendant's motion for summary adjudication

as to the punitive damages claim is **GRANTED.**


## VI. CONCLUSION

For the reasons stated above, Defendant's motion for summary

judgment/summary adjudication is:

(1)  **GRANTED** as to the defamation claim;

(2)  (a) **GRANTED** as to the claim for wrongful discharge in
        violation of public policy based on Frazier's alleged
        right to perform a pre-trip inspection of his
        equipment;

    (b) **DENIED** as to the claim for wrongful discharge in
        violation of public policy based on Frazier's right to
        refuse to work under allegedly unsafe conditions.

(3)  **DENIED** as to the discriminatory discharge claim;

(4)  **DENIED** as to the retaliatory discharge claim;

(5)  **GRANTED** as to any generalized claim of racial
        harassment or discrimination claim unrelated to
        Frazier's employment; and

(6)  **GRANTED** as to the punitive damages request.

**SO ORDERED.**


                        __/S/ Oliver W. Wanger__
                          Oliver W. Wanger
                        **UNITED STATES DISTRICT JUDGE**


**48**